## AMERICAN UNION INS. CO. OF NEW YORK et al. v. LOWMAN WINE & BOTTLING CO., Inc., et al.

### No. 6410.

United States District Court
W. D. Missouri, W. D.

Oct. 26, 1951.

See also, 94 F.Supp. 774.

Hogsett, Trippe, Depping, Houts & James, Kansas City, Mo., for plaintiffs.

Harry L. Jacobs, Robert J. Coleman, Kansas City, Mo., for defendant Merchants Bank.

J. K. Owens, Kansas City, Mo., for defendant Joe Balano.

Wm. H. Costello, Kansas City, Mo., for William Lowman, Alta Lowman, Emma Lowman, Violet Harrow.

George V. Aylward, Donald W. Johnson, Kansas City, Mo., for George V. Aylward, Jr., Receiver, Lowman Wine & Bottling Co., Inc.

Joseph Miniace, Marcy K. Brown, Jr., Kansas City, Mo., for Peter Spalito.

Gage, Hillix & Phelps, Kansas City, Mo., for Produce Exchange Bank.

DUNCAN, District Judge.

This is a declaratory judgment action brought under the provisions of §§ 2201–2202, Title 28 U.S.C.A., by thirteen non-resident insurance companies against the Lowman Wine & Bottling Company, Inc., George V. Aylward, Jr., Receiver of the Lowman Wine & Bottling Company, Inc., together with other defendants, involving seventeen insurance policies issued by the plaintiffs covering certain property destroyed as a result of an explosion and fire on March 27, 1950.

Plaintiffs allege that the policies were null and void for the reason that the fire and explosion was: " * * * instituted, instigated and set by the said William Lowman and Lowman Wine & Bottling Company, Inc.," and for the further reason that the defendants made claim under the policies: " * * * for loss and damage to property that was not in the building at the time the fire and explosion occurred, for the purpose of cheating and defrauding plaintiffs under said policies of insurance."

And for the further reason that: "The defendants William Lowman and Lowman Wine & Bottling Company, Inc., prior to the fire and explosion moved out a large amount of property insured under said policies of insurance and have made claim for it under said policies of insurance, all of which was done for the purpose of defrauding plaintiffs" and that " * * * the hazard was increased within the means and knowledge of the defendant William Lowman and Lowman Wine & Bottling Company, Inc., in that large amounts of natural gas were caused and permitted by them to escape into said building for the purpose of causing the fire and explosion in question, and the fire and explosion directly resulted as a result of the hazard."

Plaintiff asks:

"(1) That this court determine, declare, adjudge and decree, as above alleged, that an actual, justiciable controversy exists between plaintiffs and defendants involving, as above alleged. the rights and other legal relations of plaintiffs and defendants.

"(2) That this court determine, declare, adjudge and decree that the respective

rights and other legal relations of plaintiffs and defendants under said policies of fire insurance on account of, concerning and by reason of said loss and damage to said property.

"(3) That this court determine, declare, adjudge and decree that the aforesaid policies of fire insurance are null and void and were null and void at the time of the fire and explosion in question for all of the reasons hereinabove set out.

"(4) That this court declare, adjudge and decree that the defendants and neither of them are entitled to recover any amount whatever under said policies of insurance.

"(5) That this court determine, declare, adjudge and decree the amount of loss and damage sustained by defendants as a result of said fire and explosion.

"(6) That this court decree such other and further relief as to this court may seem just and proper."

The total amount of the insurance was $65,000.00. The policies were issued by the various plaintiffs between January 9, 1950 and March 4, 1950; the fire and explosion occurred on March 27, 1950. Six of the policies were issued on January 9, 1950; two on January 10, 1950; six on January 20, 1950; one on February 28, 1950 and one on March 3, 1950, and one on March 4, 1950. The policies were obtained by Paul Rosenberg and Ted Charno, insurance brokers, who were representing the insured. In no respect, and in none of the negotiations were Rosenberg and Charno the agents of the insurers. The policies were issued and delivered to Rosenberg and Charno, and in turn delivered by them to the insured.

All of the policies were issued with loss payable clauses to certain of the mortgagees, and to other lienholders or creditors of the insured, with the exception of two policies for $2500.00 each which were issued on January 10, 1950, one by the New York Fire Insurance Company, and the other by the St. Paul Fire & Marine Insurance Company, which contained standard mortgage clauses in favor of the Produce Exchange and Merchants Bank of Kansas City, creditors of the insured. The loss payable clause attached to the policies provides: "Loss or damage, if any, under this policy, shall be payable to Produce Exchange Bank and/or Merchants Bank of Kansas City, or assigns, Kansas City, Missouri, mortgagee (or trustee) as interest may appear, and this insurance, as to the interest of the mortgagee (or trustee) only therein, shall not be invalidated by any act or neglect of the mortgagor or owner of the within described property;"

All of the policies were ordered with loss payable clauses. Within a few days after these policies were issued, the New York Fire Insurance Company and the St. Paul Fire & Marine Insurance Company issued loss payable clauses to take the place of the standard mortgage clauses and delivered them to Rosenberg and Charno, the agents of the insured, but they were never delivered to the insured, or to the mortgagee named in the standard mortgage clauses. These two companies contend that the standard mortgage *clauses were issued through mistake.* Each of the policies carried the following provisions:

"This Company * * * does insure. * * * to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss * * * nor in any event for more than the interest of the insured * * *".

"This policy is made and accepted subject to the foregoing provisions and stipulations and those hereinafter stated, which are hereby made a part of this policy, together with such other provisions, stipulations and agreements as may be added thereto, as provided in this policy."

"This entire policy shall be void if, whether before or after a loss, the insured has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the assured therein, or in case of any fraud or false swearing by the insured relating thereto."

"Unless otherwise provided in writing added hereto this Company shall not be-

liable for loss occurring (a) while the hazard is increased by any means within the control or knowledge of the insured. * * "

Defendant Lowman Wine & Bottling Company, Inc., is in the wholesale liquor business, and in the bottling and sale of wine at wholesale. Some time prior to the fire and explosion, the United States had libeled and taken possession of about $8000.00 worth of wine which had been bottled, alleging that it had been adulterated through the use of water, and reduced in proof content below that authorized by law.

The defendant company had not enjoyed a profitable business, and was financially involved. In the early morning of March 27, 1950, an explosion occurred and a fire resulted, which wrecked the front end of the building and destroyed such contents as were in the building at the time.

In the building in which the business of the insured was conducted, the Lawrence Warehouse Company had leased certain quarters in which there had been stored some of the merchandise of the insured, along with merchandise belonging to other persons.

The office of the insured was on the first floor, and therein was located the usual office equipment. Its bottling equipment and several large vats in which wine was stored preparatory to bottling, was located on the same floor. The insured claimed that at the time the insurance policies were written, there was $35,000.00 worth of equipment in addition to the merchandise in the building, and that there had been no depreciation or depletion of the equipment or stock at the time of the fire. The large plate glass windows in the building were broken out and glass was scattered all over the adjacent sidewalk and street. Several fire companies responded and numerous firemen were in attendance at the fire.

The office was a large room with a ceiling approximately 15 feet high; it was heated by a gas heater of the blower type; this heater was attached to the ceiling by means of iron braces attached to the ceiling, and extending about 4 feet below the ceiling. A gas pipe ran up the side of the building, made a right angle turn when it reached the ceiling, extended along the surface of the ceiling for several feet, made another right angle turn, and extended down approximately 4 feet. This pipe extending from the ceiling to the heater was attached to the heater by means of a union. When the fire was over, this heater was lying on the floor of the office, the fire having completely destroyed the second floor. The union unquestionably had been loosened and unscrewed prior to the time of the fire. The pipe extending up the wall, over the ceiling and down into the heater was not bent or twisted in any manner, indicating no stress or strain which would separate the parts of the union and forcibly disconnect the heater from the feed pipe.

The defendants sought to show that the threads in the union connecting the heater and the adjoining pipe were damaged, and that the explosion separated the union. The court very carefully inspected the threads, and while the first, and possibly the second thread showed signs of having been used, yet the fact cannot be fairly disputed that the union was in good condition, and that the threads, when screwed together, formed a perfect union. To me the conclusion is inescapable that the union had deliberately been loosened and that as a result of this loosening, gas had escaped therefrom into the room, was ignited causing the explosion and fire.

There was a pilot light attached to the heater, which, when the room had become filled with gas, could have ignited it. The explosion occurred in the early hours of Monday morning. The place of business had not been open for business on Saturday or Sunday. Defendants contend that the explosion resulted from the escape of gas from the mains of the Gas Service Company, or from some other source than that in its own building, and that it was this gas which became ignited and caused the explosion. There is no substantial evidence indicating this fact.

On Monday afternoon following the fire, an adjuster representing the insurers contacted defendant Lowman, President of the company, in an effort to determine the amount of the loss. On the following day he received a statement through the mail

which purported to cover the amount of the loss, including the merchandise in the building. The equipment as well as the stock was included in this list. The amount of stock was listed at approximately $20,000.00, which comprised 400 cases of whiskey supposed to have been in the warehouse; 1000 cases of beer supposed to have been in the basement beneath the office; $4000.00 worth of new bottles, and other property supposed to have been located in the building.

The list was not sworn to and was not a formal proof of loss. There never was a formal proof of loss made, because the plaintiffs brought this action within the time in which the insured had the right to file proof of loss. Plaintiffs contend that this list submitted by the insured, did not correctly represent the amount and value of the property, that it was known to have been false, and was made for the purpose of cheating and defrauding the insurers. The defendants contend that the books and papers of the company were destroyed in the fire, and that the list furnished to the adjuster was made up from a list which had been prepared some time prior to the fire.

Numerous firemen, including the District Fire Chief, who were present at the fire, testified that there was no fire in the basement, and that they were in and about such portion of the building as remained after the fire was extinguished. Several other witnesses testified that they saw no beer at all in the basement, or any other place in the building. This, in the face of Lowman's testimony that there were 1000 cases.

The secretary, Mrs. Violet Harrow, gave her deposition on July 25, 1950 in which she answered, when asked if there was any beer, "a few cases of bottles." At the time of the trial, she testified that there were probably 1000 cases of beer. It seems utterly inconceivable that there could have been 1000 cases of beer, or any considerable portion of that amount present in the building, and not have been observed by the numerous firemen, who have no in-

terest in this case, and who were present at the time of the fire and subsequent thereto.

The list which Lowman submitted to the adjuster also showed there were approximately 400 cases of whiskey in the warehouse. The firemen did not see this liquor, they did not see any considerable amount of glass which would naturally have resulted from the destruction of 400 cases of liquor, and would have contained at a minimum 4800 bottles, and if they had been comprised of pints or half pints, the number would have been increased accordingly. The testimony shows that some of the firemen saw several cases of champagne and some cordial, but no other cases of liquor. They saw no evidence of the destruction by fire or explosion of $4000.00 worth of bottles.

The Lawrence Warehouse Company had rented the premises above the office in which the explosion occurred; steps led to the second floor and to the rear of the front of the building. A man named Walter L. Cooper, who resided at 15 West 6th Street in Kansas City, Missouri, was employed by the Lawrence Warehouse Company as warehouseman, and for his services they paid him $50.00 a month. He was also in the employ of the Lowman Wine & Bottling Company and received a similar wage of $50.00 a month from them.

At the conclusion of the hearing of the case, neither party had been able to locate Cooper. Apparently he maintained a room at the above address and had been out seeking employment, or at least, was not available. At the direction of the court, the case was thereafter adjourned for several days, and a further search made for him. It was some days before he could be located. His testimony shows that he possessed a key to the warehouse, which was not attached to a key ring, but which he carried in his pocket. He also had custody of the warehouse certificates which he kept in a lock box on the premises of the insured.

The warehouse receipts which were produced in connection with Cooper's testimony do not show any endorsements permitting the removal of any whiskey from

the warehouse. The first receipt was dated as early as January 4, and the last March 4. Although the Lowman Wine & Bottling Company was in business, and supposedly a going concern, it had apparently sold no whiskey during the months of January, February, and up until the time of the fire.

Witness Cooper further testified that he constructed the door leading into the warehouse, room, and that it was approximately 4 feet wide and 6 inches thick; that he had attached thereto a strap hinge lock to the door and to the door jamb or brick wall, against which the door closed. He further testified that the hasp was attached to the brick wall, which from the photograph, appeared to be 12 inches thick, by means of bolts which extended clear through the brick wall and were riveted on the inside.

After the fire this door was standing ajar, and was scorched and burned, inside and out. The hasp and the padlock were still attached to the door, and the warehouseman unlocked the padlock and delivered it to the Distrct Fire Chief. A photograph taken after the fire clearly shows the hole in the brick wall which secured the hasp. The witness' only explanation of how the door came open was that it must have been blown open. This explanation seems unreasonable. In the first place, the explosion unquestionably occurred on the lower floor and in the front of the building where the gas heater was located. If gas had accumulated in the upper portion of the warehouse and had been ignited so as to blow the door open, it could not have done so without in some wise damaging the wall through which the riveted bolt or bolts would have been pulled or drawn. The hole, as indicated by the photograph, was perfectly clean and showed no evidence whatever of any acts of violence.

From these facts, it seems to me there is but one plausible conclusion—that the padlock was removed by some person who had a key thereto. The bolt or bolts which the witness testified extended through the brick wall and riveted on the other side, were so altered as to permit them or it (whether it be one or more bolts) to be drawn through the wall without any damage thereto and then to replace the padlock, so that the door would open as it was found subsequent to the fire.

James E. Hensley, President of the Produce Exchange Bank, made an inspection of the warehouse three weeks prior, on March 1, 1950, and found the whiskey covered by the warehouse certificates. The Produce Exchange Bank had made a loan of $10,000.00 to the insured and held warehouse certificates as security therefor. It was in this connection that Hensley made the inspection on behalf of the bank.

On March 16, 1950, Fred Dodson, District Manager for the Lawrence Warehouse Company in Kansas City, made an inspection of the premises and testified that he found 391 cases of spirituous liquors in the warehouse.

At the trial Lowman denied that he had a key to the warehouse. However, in his deposition which was taken on June 27, 1950, he stated that he did have a key to the warehouse, and it is my belief that the first statement was the truthful one. Lowman was a very unsatisfactory witness. After the trial the court observed that he seemed to know less about more things concerning his business than any witness he had ever heard. I think a review of the record will clearly substantiate that observation. He did not know from whom the liquor had been purchased, except in a very general way; he did not know when it had been purchasd; he didn't seem to know what had been paid for it. He had little or no knowledge concerning the business of the company of which he was President, and to which he was giving a considerable amount of his time and attention.

From the evidence I am unable to say who loosened the union which permitted the gas to escape. Several people had access to the building and to the office of insured, but I am convinced that it was an inside job, intentionally done to accomplish the exact result it did accomplish—a fire. The defendants deny any knowledge as to how the union became disconnected or how the fire started, and insist that all of the equipment and merchandise covered by the

policies of insurance were in the premises at the time of the fire.

In view of the court's findings and conclusions, it is not necessary to discuss or make any finding with respect to the quantity or value of the equipment and other property, aside from the beer and whiskey which were in the building at the time of the fire. The vats at least were there. They were attached to the property. As to the remainder, it is possible it could have been destroyed, but it is my opinion that there was no beer, and very little spirituous liquor in the building at the time of the fire.

It is further my opinion that at the time of the delivery of the list of the alleged destroyed property which the defendant Lowman contended was in the building, he knew that the whiskey and beer were not there, and that it had been removed prior to the fire.

█ It is further my opinion that at the time he testified in court as to the amount of beer and liquor in the premises at the time of the fire, he knew that his testimony was untrue, and that such testimony was a willful misrepresentation of material facts and circumstances concerning the insurance, and that by reason thereof, all of the policies of insurance are null and void as to the insured and all persons who claim through or under the insured.

This applies without question to the receiver who was appointed after the fire occurred for the purpose of taking over and preserving the property, and to the creditors who had lent money to the corporation or Lowman, and to those in whose favor the loss payable clauses in the policies were made.

The only remaining question for determination is that presented by the attaching of the standard mortgage clauses, to the two policies issued by the New York Fire Insurance Company and the St. Paul Fire & Marine Insurance Company. It is my recollection that these policies were in the possession of the bank following their issue, but as heretofore stated, the loss payable clauses issued subsequent thereto and delivered to the brokers who originally obtained the policies, were not delivered by such brokers either to Lowman or to the bank. I think it cannot be disputed that these policies were ordered by the brokers with the loss payable clauses, as were all of the other policies, and that the attaching of the standard mortgage clauses was a mistake on the part of the insurer.

█ The defendants Produce Exchange Bank and Merchants Bank contend that the standard mortgage clause entitled it to recover the amount of the policy regardless of any action or conduct on the part of the insured. Certainly this is true unless there was clearly a mistake in the issuing of such clause. This provision attached to the policies of insurance creates an obligation between the insured and the mortgagee which becomes absolute, and no action or conduct or fraud on the part of the insured may in any wise affect the liability of the insurer to the mortgagee.

Of the 17 policies issued as heretofore stated, 15 of them contained the loss payable clause, and apparently all of them were ordered with that type clause. The bank knew that the other policies contained such a clause, and there is no evidence before the court that the bank ever had any knowledge that these two policies contained the standard mortgage clause.

It was not until the case was on trial and the introduction of the policies in evidence that counsel for the defendant bank discovered the standard mortgage clauses and thereafter amended its answer to conform to the fact. Until the policies were introduced in evidence, apparently the insurers believed that the standard mortgage clause had been replaced by the loss payable clause. Under the circumstances, it would seem that the standard mortgage clauses did not ripen into a contract between the insurers and the mortgagee, and because thereof, they should not be bound. As soon as the mistake was discovered, the loss payable clauses were made out and delivered to insured's brokers, but were never delivered to Lowman by them. The evidence does not show that any additional premium was charged for the mortgage payable clause.

The Court concludes that there is a justiciable controversy existing between the

plaintiffs and the defendants, and that because of the findings aforesaid, and because of the fraud of the insured, acting through its President, the defendant Lowman, the policies of insurance are void.

It is so ordered.