J. B. KRAMER GROCERY CO., INC. and J. B. Kramer, Plaintiffs,

v.

GLENS FALLS INSURANCE CO. et al., Defendants.

No. B-71-C-37.

United States District Court, E. D. Arkansas, N. D.

April 5, 1973.

H. David Blair, of Murphy, Arnold & Blair, Batesville, Ark., for plaintiffs.

Jeff Davis Jr., of Davis, Plegge & Lowe, Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

HENLEY, Chief Judge.

This is an action brought by J. B. Kramer Grocery Company, Inc. (Kramer), and its principal shareholder, J. B. Kramer, on six policies of fire insurance issued, respectively, by the defendants, Glens Falls Insurance Co., Continental Insurance Co., Aetna Insurance Co., St. Paul Fire & Marine Insurance Co., Royal Indemnity Co., and Tri-State Insurance Co. Federal diversity jurisdiction is established. The case presents a number of issues only one of which, presently to be stated, is before the Court for decision. That issue has been submitted to the Court on the pleadings, oral testimony, documentary evidence, and informal memorandum briefs.

Kramer is an Arkansas corporation with its principal place of business in the City of Batesville, Arkansas. It is engaged in the wholesale grocery business, and it does a very substantial credit business in North Arkansas. J. B. Kramer owns a majority of the stock in the corporation, and is its managing officer. All of the defendants are foreign corporations authorized to do business and doing business in Arkansas.

Prior to March 18, 1969, Kramer and Newport Grocery Co., Inc. were operating a wholesale and retail grocery business at a location on Front Street in the City of Newport, Jackson County, Arkansas. On the date just mentioned the business was sold to Teddy Dean Watson dba Warehouse Sales; the transaction was financed by Kramer, and Watson's

initial obligation to Kramer was $50,000. Watson did not own the building, and Kramer had no interest in it.

On March 18, 1969, Watson executed in favor of Kramer a security agreement covering the inventory of the grocery business. This agreement secured repayment of the initial obligation of Watson and also secured future advances that were made from time to time by Kramer until the store burned in July 1971.

Paragraph 7(d) of the security agreement obligated Watson to carry insurance on the contents of the building in which the store was located for the benefit of Kramer. Kramer had the right to prescribe the amount of insurance to be carried, to prescribe the mortgage clauses to be included in the policies, and to receive and retain possession of the policies themselves.

At date of sale Kramer was the holder of a fire insurance policy issued by the defendant, Glens Falls Insurance Co., to Kramer and to Newport Grocery Co., Inc., as co-insureds. When Watson acquired the business, that policy was modified in two respects by endorsement. The amount of the policy was increased from $30,000 to $50,000; Watson was identified as the insured and Kramer was identified as loss payee. That policy had been issued by the White River Insurance Agency of Batesville and appears to have been in the possession of Kramer.

As Watson's operation continued and as his indebtedness to Kramer increased, it was necessary for Watson to obtain additional insurance. He did business with the Wallace Insurance Agency at Newport, and he requested that Agency to place the necessary insurance and protect the interest of Kramer as mortgagee.

By the summer of 1972 the six policies in suit were in full force and effect and expressly covered the contents of the store building. They did not cover and did not purport to cover the building or any other real estate. The policies insured the contents of the building, consisting of merchandise, furniture, and fixtures, against loss or damage on account of fire and other hazards. One of those policies was the old Glens Falls policy which has been mentioned and which had been renewed from year to year. Four of the other five policies were written by the Wallace Insurance Agency at Newport; the fifth of those policies was written by the Best Insurance Agency of Little Rock at the request of the Wallace agency.

No question is raised in this litigation as to the authority of the issuing agencies to write the policies or to bind their companies. All of the policies were standard form printed policies prepared by the companies and delivered to the agencies. The description of the property insured was typed in an appropriate blank space in each policy; this was done by employees of the local agencies.

In the Glens Falls policy Kramer was correctly identified as the loss payee. In the other policies J. B. Kramer was erroneously identified as loss payee, and that error explains his presence in the case as a party plaintiff. No claim is made that the error in designation of the loss payee has any effect on the rights of Kramer.

As of July 2, 1972, the total insurance on the contents of the building amounted to $125,000, distributed as follows:

| | |
|---|---|
| Glens Falls | $50,000 |
| Continental Insurance Co. | $20,000 |
| Aetna Insurance Co. | $15,000 |
| St. Paul Fire & Marine Insurance Co. | $20,000 |
| Royal Indemnity Co. | $10,000 |
| Tri-State Insurance Co. | $10,000 |

While the security agreement stipulated that Kramer was entitled to possession of the policies, the Court finds that, except for the Glens Falls policy, they were actually delivered to and held by Watson. Copies of certain endorsements relating to all six policies were mailed to Kramer.

On the date last mentioned above the insured property was totally destroyed by fire, and the loss may have exceeded

the total insurance that had been written on the property. Watson's debt to Kramer at the time of the fire was also in excess of the insurance.

It was and is strongly suspected that Watson burned his store or caused it to be burned, and it is the Court's understanding that he has been charged with arson in the Circuit Court of Jackson County, Arkansas, but that the case has not yet been tried.

Arson, if proved, would be a good defense to any suit on the policies brought by Watson, and arson is an issue in this case since the defendants take the position that the rights of Kramer are no better than those of Watson. The plaintiffs take the contrary position and have sued to recover the full amounts of all six policies plus statutory penalties and attorney's fees.

Although, as just stated, arson is an issue in the case as is the amount of the loss, the Court is not called upon to decide those issues at this time. What the Court is called upon to decide is whether the defense of arson is available to the defendants as against Kramer. If that question is answered in the affirmative, the arson issue will have to be tried as will the issues of the amount of the loss unless the parties are able to agree on that amount, which they may be able to do. If that question is answered in the negative, the issue of arson goes out of the case.

Each of the policies in suit contains a "Standard Mortgage Clause" which is printed in the body of the policy. That clause provides, in substance, that the rights of a mortgagee will not be defeated by any act or neglect of the mortgagor-insured or by the owner of the building. However, the printed clause in each policy contains language which clearly limits the scope of the clause to real property, and no real property is involved here. The position of the plaintiffs is that the limiting language of the mortgage clauses conflicts with the typed description of the personal property covered by the policies and renders the policies ambiguous. From that premise plaintiffs argue that the policies are to be construed most strongly against the defendants, and that the conflict should be resolved in favor of the plaintiffs by treating the limiting language as surplusage. Defendants contend that there is nothing conflicting or ambiguous about the policies, and that the limiting language in controversy should be given its intended effect.

I.

If a policy of property insurance covers mortgaged property, and if the policy does not recognize and protect the mortgagee's interest, he has no legal right to the proceeds of the policies although he may have an equitable lien thereon. See e. g. Wheeler v. Insurance Co., 1879, 101 U.S. 439, 25 L.Ed. 1055.

Such an equitable lien, which may easily be lost or subordinated to some other claim, is a very uncertain protection for a mortgagee, and for that reason it is customary for policies of property insurance to recognize the interest of a mortgagee in such manner as to protect to a greater or lesser extent his interest in the property and give him a legal right to policy proceeds and standing to bring suit on the policy.

This protection may take the form of a simple loss payable or "open" mortgage clause, and where such a clause is used, the rights of the mortgagee are no better than those of the mortgagor who has insured the property. In the vast majority of instances the protection provided by a loss payable clause is all that a mortgagee needs or desires regardless of whether the insured property is real, personal, or both.

However, at least as far as real property is concerned, many modern insurance policies covering property contain what is known as the "standard" or "union" mortgage clause. The difference between an open mortgage clause and a standard mortgage clause in an Arkansas fire insurance policy was discussed in some detail by Senior Judge

Miller in Consolidated Underwriters of South Carolina Insurance Co. v. Bradshaw, W.D.Ark., 1955, 136 F.Supp. 395; and the difference was noted much more recently by this Court in Sureck v. United States Fidelity & Guaranty Co., W. D.Ark., 1973, 353 F.Supp. 807. And, where a mortgagee is protected by a standard mortgage clause, his rights under the policy are not defeated by conduct on the part of the mortgagor, such as arson.

In his brief counsel for defendants at least suggests that the standard mortgage clause is not used where the insured property is personal, and that the protection of the clause is limited to situations in which the insured property is real estate. He cites in that connection certain language appearing in General Electric Credit Corporation v. Aetna Casualty & Surety Co., 1970, 437 Pa. 463, 263 A.2d 448.

Assuming, at least for the sake of argument, that the standard mortgage clause is used generally where real property is involved, and that the loss payable clause is used generally where personal property is involved,[1] the Court sees no reason, legal or logical, why a mortgagee of personal property would not be entitled to standard mortgage clause protection or its equivalent if he wants it,[2] and the Court thinks that, apart from statutory or regulatory restrictions, which do not seem to be involved here, the scope of a mortgage clause in an insurance policy is a matter of contract between the parties.

In United States v. Springfield Fire & Marine Insurance Co., 8 Cir., 1953, 207 F.2d 935, the Court of Appeals for this Circuit rejected a claim by the Government, as mortgagee of certain corn in storage, to the benefit of a standard mortgage clause appearing in a fire insurance policy obtained originally to protect a bank in connection with a loan to the insured. But, the Court did not suggest that in a proper case a standard mortgage clause might not cover personal property.

In Aetna Life & Casualty Co. v. Charles S. Martin Distributing Co., 1969, 120 Ga.App. 133, 169 S.W.2d 695, the Court was dealing with a policy containing the New York standard mortgage clause. That clause had language that limited its scope to real estate, but with a stipulation that the limiting language might be deleted so as to make the clause applicable to personal property.

And, in American Union Insurance Co. of New York v. Lowman Wine & Bottling Co., W.D.Mo., 1951, 101 F.Supp. 20, cited by defendants, the Court recognized at least by implication that a standard mortgage clause may apply to personal property.

## II.

All six of the policies here involved contained printed loss payable clauses, appearing on the first pages of the policies, and printed standard mortgage clauses appearing in the bodies of the policies. Ignoring minor variations in

---

1. It is interesting to note in this connection that in the Bradshaw case, supra, four policies were involved; two covered the building that was destroyed, and two covered the contents of the building. The policies covering the building contained the standard mortgage clause; the policies covering the contents of the building did not. It is also interesting to note the limiting language with which the Court is concerned here was employed by six separate and distinct fire insurance companies which obviously were using policy forms approved by the Arkansas Insurance Department.

2. General Electric Credit Corporation v. Aetna Casualty & Surety Co., supra, is to the effect that the "standard mortgage clause," as such, is limited to real property, and that it is available only to one who is technically a "mortgagee." However, the Supreme Court of Pennsylvania expressly recognized that a conditional vendor of personalty who is not entitled to "mortgage clause" protection may protect himself by a special agreement which differs only in name from the standard mortgage clause.

language, the clauses in all of the policies are essentially identical. It is clear that as far as recognizing and protecting mortgagee rights are concerned the printed loss payable clauses and standard mortgage clauses limited the scope of the clauses to mortgagees of real property and did not include mortgagees of personal property.

The testimony disclosed, and the Court finds, that the printed loss payable clauses were not appropriate to be used to give even initial recognition and protection of the rights of Kramer, and that broader loss payable endorsements, similar in form to Defendants' Exhibits 1 and 2, should have been attached to all of the policies.

Literally read, the printed loss payable clauses are not broad enough to protect Kramer at all, which would force Kramer to rely on its equitable lien on the policy proceeds unless those clauses should be reformed directly or indirectly. However, the defendants do not take the position that Kramer is affected adversely by the printed loss payable clauses. They concede that Kramer is entitled to the protection that a proper loss payable or open mortgage clause would have afforded, but insist that Kramer is entitled to no more protection than that.

### III.

■ No one quarrels with plaintiffs' proposition that in Arkansas, as elsewhere, insurance policies are to be read as a whole, that an effort should be made to harmonize all of the provisions of a policy, that ambiguous policies are to be construed most strongly against insurers, and that irreconcilable conflicts in policy language must be resolved against the insurers who wrote the policies and chose the language appearing therein.

Nevertheless, the Court is of the opinion that Kramer cannot prevail on this phase of the case, and that its rights are no greater than those of Watson. Thus, the arson issue remains in the case.

Plaintiffs' entire theory of conflict between the typed and printed portions of the policies and of policy ambiguity presupposes that Kramer stipulated for protection equivalent to that which the standard mortgage clauses, as printed, would give to a mortgagee of real property, that the insurance agents who effected the coverage were aware of his wishes, and that they undertook to meet them.

There is simply no evidence to sustain that presupposition. There is no question that Kramer wanted its interests "protected," and that the insurance agencies concerned undertook to "protect" them, although ineptly.[3] But there are varying degrees of protection and, as stated, in situations other than exceptional a simple loss payable clause is adequate to protect a mortgagee of personal property. Of course, in the exceptional case after loss occurs and a problem arises a mortgagee will frequently claim that he originally wanted broader protection than a loss payable clause affords, and that he ought to be awarded it ex post facto.

■ As noted, we are dealing here with six printed policies, prepared by six different companies, and containing the same or essentially the same limiting language. We are also dealing here with the actions taken by three different insurance agencies located in three different Arkansas cities. Ignoring the mistakes made by the agencies about the loss payable clauses, which mistakes are more annoying than anything else, the Court is of the opinion that in Arkansas the protection usually and customarily afforded a mortgagee of personal property is that provided by a simple loss payable clause.

The agent who wrote four of the five other policies conceded that a broader loss payable clause should have been used, and that his agency's failure to use one was a mistake.

---

3. One of the agents testified that at the time he prepared the Glens Falls policy, he did not know the difference between a loss payable clause and a mortgage clause and that he used them interchangeably.

The Court finds that Kramer did not ask for any more protection than that; that the agencies thought that Kramer wanted what was usual and customary; and that they undertook to give it to Kramer. Actually, it appears to the Court that the parties simply did not give any consideration to the possibility that Kramer would ever need any more protection than it was getting.

As has been said, Kramer had the Glens Falls policy in its possession, and it had a right to the possession of the other five policies. If Mr. Kramer had exercised that right, and if he had examined the policies carefully or caused them to be examined carefully, he could hardly have avoided observing the limiting language which is causing trouble now, and if he was not satisfied with his company's protection, he could have insisted on something else. He did not do any of those things prior to the fire.

One of the cases cited by counsel for plaintiffs is London & Provincial Marine & General Insurance Co., Ltd. of London v. Sykes, Tex.Civ.App., 1933, 66 S.W.2d 382. In that case the insurance agency made the identical mistake with respect to the loss payable clause that the insurance agencies involved here made; with knowledge that personal property only was being insured for the benefit of a mortgagee, the agent in Sykes issued a policy with a loss payable clause limited to "building items," i. e. limited to real property. After the loss occurred, the insurance company refused to recognize that the mortgagee had any rights under the policy. The Court of Appeals quite properly held that the limiting language should be ignored; but, the Court did not hold that the mortgagee was entitled to any additional protection.

Another case cited by counsel for plaintiffs is Aetna Life & Casualty Co. v. Charles S. Martin Distributing Co., supra. In that case the insured or the mortgagee specifically stipulated that the language of the standard mortgage clause limiting the scope of the clause to

real property should be deleted, and the agent failed to do so. That is not the case here.

The Court's decision on this phase of the case does not appear to call for the entry of a formal order; this memorandum will, of course, be filed as part of the record.