SAINT PAUL–MERCURY INDEMNITY
COMPANY, Harry B. Hogan, d/b/a
Harry B. Hogan Painting Company, and
Lonnie Sisney, Plaintiffs,

v.

M. LANZA, d/b/a Lake Charles Electric
Company, Defendant.

Civ. A. No. 356.

United States District Court
W. D. Arkansas, Harrison Division.

June 2, 1955.

Arthur N. Wood, Yellville, Ark., for petitioner.

Goodwin & Riffel, Little Rock, Ark., Allen, Woolsey & Fisher, Springfield, Mo., for respondent.

## JOHN E. MILLER, District Judge.

The present proceeding arises upon a petition for distribution of money paid in satisfaction of the judgment heretofore entered in this case. 116 F.Supp. 491. The primary question raised by the petition relates to the proper disposition of attorneys' fees, and the determination of this question requires a reference to the proceedings heretofore had in the case.

In January, 1953, Lonnie Sisney, Virgil C. Carroll, and Paul A. Jennings were employed by Harry B. Hogan, a contractor. On January 26, 1953, Sisney, Carroll and Jennings were injured by the negligence of a third party while they were acting within the scope of their employment with Hogan in Arkansas. Saint Paul-Mercury Indemnity Company, the workmen's compensation insurance carrier for Hogan, was notified of the accident and the Company in turn notified Messrs. Allen, Woolsey & Fisher, its attorneys in Springfield, Missouri. On January 27, 1953, Mr. Fisher, accompanied by Hogan, went to the Bull Shoals Dam where the accident occurred and made a preliminary examination of the incident. On January 28 and 29, another attorney associated with said law firm visited the site of the accident and took the statements of several witnesses.

All three of the injured workmen had been admitted to Saint John's Hospital in Springfield, Missouri, and Mr. Fisher, and other members of his firm, had a number of conferences with them concerning their compensation benefits. Saint Paul admitted its liability to all three of the injured employees for compensation benefits, and there was never any dispute concerning said compensation.

About two weeks after the accident Mrs. Sisney contacted Mr. Arthur N. Wood, an attorney in Yellville, Arkansas, and informed him of the accident and of the fact that Sisney was worrying about everything. At that time the Sisneys were living in a house owned by Mr. Wood's father-in-law, and were acquainted with Mr. Wood. Mr. Wood told Mrs. Sisney that her husband should not be worrying and that the most important thing was for him to get well first.

In the meantime, on February 25, 1953, Carroll and Jennings employed the firm of Allen, Woolsey & Fisher to represent them in a third party suit against M. Lanza, doing business as Lake Charles Electric Company. On March 2, 1953, Carroll and Jennings, through their attorneys, filed separate suits against Lanza in the Circuit Court of Baxter County, Arkansas.

On March 7, 1953, after having talked to Mrs. Sisney several times, Mr. Wood wrote a letter for Mrs. Sisney to take to her husband. He advised Sisney not to worry about the bills and other matters, not to sign any papers, but to accept the compensation payments. He also told Sisney that if anyone talked to him (Sisney) about the accident, to send them to him (Wood). Mr. Wood then arranged for some of Sisney's creditors to give him further credit at that time.

On March 20, 1953, the Carroll and Jennings cases were removed to this Court by the defendant.

In April, 1953, Sisney conferred with Mr. Wood and they reached an oral agreement for Wood to represent Sisney for a fee of one-third of the amount, if any, recovered by Sisney from Lanza over and above the amount that would have to be repaid to the workmen's compensation carrier, if any. Mr. Wood talked to several witnesses about the accident, and did some research of the law pertaining to Sisney's rights, but in view of Sisney's poor physical condition Wood did not feel that the time was ripe for filing suit against Lanza. In this connection it should be noted that Sisney was in and out of the hospital five times from the time of the accident until June 3, 1953, and even at the time of the trial on November 5 and 6, he was still required

to have medical treatment every two weeks, and was still emotionally disturbed. See, Finding of Fact No. 8 in Carroll v. Lanza, D.C.Ark., 116 F.Supp. 491, at page 500.

In May, 1953, Messrs. Goodwin & Riffel, attorneys in Little Rock, Arkansas, were employed by Saint Paul to take action on its claim for compensation it was then paying to Sisney. A conference was had with Messrs. Allen, Woolsey & Fisher in Springfield, Missouri, and it was decided that the Goodwin firm would be associated with the Allen firm in representing Saint Paul, Carroll and Jennings. It was also decided that suit should be filed by Saint Paul and Hogan, with Sisney being joined as a plaintiff, against Lanza to recover the compensation payments made by Saint Paul to Sisney. In the Sisney case the Allen firm was to be associated with the Goodwin firm.

On June 13, 1953, a suit was filed by Saint Paul and Hogan against Lanza, and Sisney was made a party plaintiff. On the previous day, June 12, Messrs. Goodwin & Riffel had written Sisney advising him of the filing of the suit and enclosing a copy of the complaint.

On June 27, 1953, Hogan and Saint Paul were permitted to intervene in the Carroll and Jennings cases. In August, 1953, several letters were written to Sisney, in addition to two telephone calls, regarding the taking of Sisney's discovery deposition. Sisney informed Mr. Wood that someone wanted to take his deposition for use in the Carroll and Jennings cases, and Wood told Sisney that would be all right since later he might want the cooperation of Carroll and Jennings in the trial of his case.

The date for the taking of the deposition was finally set for August 27, 1953. On August 26, Messrs. Goodwin, Riffel, Fisher, Carroll and Koonce, Saint Paul's claims manager, went to Sisney's home and discussed the accident with him. Sisney then accompanied them to the site of the accident and he and Carroll pointed out the relevant locations. They then went by the home of a witness, David P. York, and discussed the case with him. Sisney's discovery deposition was taken on August 27, 1953, the defendant being represented by Messrs. Wright, Harrison, Lindsey & Upton and the plaintiffs being represented by Messrs. Goodwin & Riffel and Mr. Fisher.

A pre-trial conference was held on August 31, 1953, and at that time the three cases were consolidated for trial. On September 1, 1953, upon consent of the attorneys present the Court entered an order striking the cases from the trial calendar in the Harrison Division and transferring the case to Fort Smith for trial to the Court, without a jury. Mr. Wood had no notice of the pre-trial conference and was not present.

Early in October, 1953, Mr. Riffel and Mr. Koonce made a trip to the scene of the accident to contact other witnesses. On October 7, 1953, Goodwin & Riffel wrote to Sisney requesting that he fill out blank withholding forms showing his past income. On October 26, they went to Sisney's home, discussed the case further with him, and picked up the withholding forms.

Up until this time, Sisney had not told anyone, except possibly Carroll, that he had employed Mr. Wood to represent him. Neither had he told Wood of the fact that he had been contacted by Messrs. Goodwin & Riffel or that a suit to which he was a party had been filed.

On October 27, 1953, Mr. and Mrs. Sisney went to Mr. Wood's home and wanted to talk to him about Sisney's compensation payments and the suit that had been filed. Since the 27th was on Sunday, Mr. Wood asked that they wait until the next day to discuss the matter. On Monday morning, October 28, Sisney told Wood that Messrs. Goodwin & Riffel had been to see him on the 26th, and that his case was coming up soon. Sisney also told Wood that he had no previous knowledge of having a case coming up, and that he had not been notified of such action being taken. This was the first information Wood had concerning the suit, and he immediately placed a

long distance telephone call to Messrs. Goodwin & Riffel and was advised of the suit, the work that had been done in the case, and that Sisney had been notified of the suit. After the call Wood asked Sisney to collect all the correspondence he had concerning the matter. The next day Sisney brought several letters to Wood, including the letter of June 12, 1953, advising of the filing of the suit. Wood asked Sisney why he hadn't advised him (Wood) about the letter and Sisney replied that he did not know what the letter meant.

On October 30 or 31, 1953, Wood and Sisney went to Little Rock for a conference with Goodwin & Riffel. The attorneys discussed the case and Wood suggested that he would have Sisney examined by another doctor to determine the extent of his permanent disability. However, it was finally decided that it would be better to have Sisney brought to Fort Smith, Arkansas, prior to the trial for examination at the Holt-Krock Clinic. Wood also suggested that he would go to Springfield and interview the two doctors who had examined Sisney, but he was told that Mr. Fisher was going to bring the doctors to Fort Smith to testify in the three cases and the doctors could be interviewed at that time. Wood agreed to and did bring either three or four of the witnesses to Fort Smith on November 4, 1953, the day before the trial.

Sisney had been brought to Fort Smith on November 3 by Mr. Riffel and Mr. Koonce, and was examined in the Holt-Krock Clinic. On November 4, the day before the trial, all the counsel and witnesses stayed at the Ward Hotel in Fort Smith and all of the counsel interviewed all the witnesses at that time. That evening it was decided that Mr. Goodwin and Mr. Fisher would take the active roles in the trial. At that time Mr. Wood was prepared to try Sisney's case, but felt that in view of the circumstances he should defer to the suggestions of the other attorneys that Mr. Goodwin and Mr. Fisher try the cases.

The case was tried to the Court, without a jury, on November 5 and 6, 1953, and on November 13, 1953, the Court entered judgments in favor of the plaintiffs in the following amounts: Sisney's case, $22,500; Carroll's case, $18,000; Jennings' case, $6,000. See Carroll v. Lanza, supra, 116 F.Supp. 491.

The three cases were appealed by the defendant, Lanza, to the Court of Appeals for this Circuit. After a conference between Mr. Wood and Goodwin & Riffel in Little Rock, and a conference between Wood, Fisher, Goodwin and Riffel in Harrison, it was decided that Mr. Goodwin would write the brief on appeal. The cases were consolidated for submission and were submitted to the Court of Appeals on May 7, 1954. Mr. Wood was present and prepared to argue the case for Sisney, but it was agreed that Mr. Goodwin and Mr. Fisher would argue the case, which they did.

In the meantime, in February, 1954, Mr. Wood took Sisney to Little Rock and appeared before the Workmen's Compensation Commission. At that time the parties worked out a complete settlement of Saint Paul's compensation liability to Sisney. Mr. Wood neither asked for nor received any payment for his services in representing Sisney before the Commission.

On July 30, 1954, the Court of Appeals affirmed the Sisney and Jennings cases, but reversed the Carroll case. Lanza v. Carroll, 8 Cir., 216 F.2d 808. Lanza filed a petition for rehearing in the Sisney and Jennings cases, and Carroll filed a petition for rehearing in his case. The petition for rehearing in the Carroll case was denied August 24, 1954, and on November 8, 1954, the Supreme Court of the United States granted certiorari, 348 U.S. 870, 75 S.Ct. 113, in said Carroll case. The case is now pending in the Supreme Court.*

* On June 6, 1955, the Supreme Court reversed the Court of Appeals, thus reinstating the judgment of this court. 75 S.Ct. 804.

After the petition for rehearing was filed in the Sisney and Jennings cases, and after Mr. Goodwin had submitted plaintiffs' response to the petitions, it was brought to the attention of the Court of Appeals that a case involving the same legal issue, i. e., the right of the employee of an insured subcontractor to sue the prime contractor in tort as a third party under the Arkansas Workmen's Compensation Act, was pending in the Arkansas Supreme Court. The Court of Appeals then deferred action on the petitions for rehearing in the Sisney and Jennings cases pending the decision of the Arkansas Supreme Court in the case of The Baldwin Co. v. Maner.

Mr. Goodwin, realizing that the outcome of the Baldwin case would be determinative of the issue urged in the petition for a rehearing in the Sisney and Jennings cases, offered his services to Messrs. Cole & Epperson, the attorneys representing Judge Maner in the Baldwin case. (The Baldwin case was in the Supreme Court upon a petition for a writ of prohibition alleging that the Circuit Court was without jurisdiction to try a case brought by an employee of an insured subcontractor against the prime contractor.) Thereafter Mr. Goodwin prepared the brief of respondent in the Baldwin case and argued the case before the Arkansas Supreme Court. On December 6, 1954, the Arkansas Supreme Court denied the writ of prohibition. The Baldwin Co. v. Maner, Ark., 273 S.W.2d 28. Mr. Goodwin neither asked for nor received any remuneration for the services he performed in the Baldwin case.

On December 15, 1954, the Court of Appeals denied the petitions for rehearing in the Sisney and Jennings cases. On the same date the defendant Lanza gave said plaintiffs and their attorneys drafts in payment of the judgments. The draft in the Sisney case was in the sum of $23,968.36, and said draft has been paid into the registry of this Court.

On January 20, 1955, the petition of the plaintiff, Lonnie Sisney, for distribution of the money paid on the judgment, came on for hearing before the Court. At the hearing the parties stipulated that the unrecoverable court costs and other expenses attributable to the prosecution of the Sisney case amounted to $674.09; that said amount had been paid by Saint Paul; and that said amount should be first deducted from the amount of the draft and paid to Saint Paul. The parties also stipulated that the total sum of $9,107.73 had been paid by Saint Paul on behalf of Sisney for compensation and medical expenses, and that Saint Paul's liability to Sisney had been exhausted.

Mr. Wood spent $415 of his own money and drove more than 3,000 miles in connection with his representation of Sisney. To date Wood has received no remuneration for any of the services he has performed for Sisney. Neither has he been reimbursed for expenses.

There is little dispute between the parties as to the material facts heretofore stated by the Court. There is, however, a substantial dispute as to the proper application of the law to those facts.

The first question for determination is whether the attorneys' fees are a part of the "cost of collection" and must be deducted from the total amount recovered by Sisney from Lanza before the remainder of said amount is distributed. Section 81–1340, Ark.Stats.1947, Annotated, provides as follows:

"* * * (b) Subrogation. An employer or carrier liable for compensation under this Act for the injury or death of an employee shall have the right to maintain an action in tort against any third party responsible for such injury or death. After reasonable notice and opportunity to be represented in such action has been given to the compensation beneficiary, the liability of the third party to the compensation beneficiary shall be determined in such action as well as the third party's liability to the employer and carrier. After recovery shall be had against such third party, by suit or

otherwise, the compensation beneficiary shall be entitled to any amount recovered over and above the amount that the employer and carrier have paid or are liable for in compensation, after deducting reasonable costs of collection, and in no event shall the compensation beneficiary be entitled to less than one-third of the amount recovered from the third party, after deducting the reasonable cost of collection."

Petitioner, Lonnie Sisney, contends that the "cost of collection" referred to in the Statute does not include attorneys' fees. Contrarily, respondents contend that said "cost of collection" does include attorneys' fees, and in support of said contention respondents cite, inter alia, the case of Boulden v. Herring, D.C. Ark., 126 F.Supp. 885, 893, where this Court said:

"While it is true that the Workmen's Compensation Acts vary from state to state, nevertheless it is generally held that attorney's fees are to be deducted before the lien of the insurance carrier attaches. * * * "

However, a reading of this sentence in context discloses that it is merely a statement of the reason for the Court's original decision in the case. It is true that this Court originally was of the opinion that attorneys' fees were part of the cost of collection, and so held in the Boulden case, supra, when it was first before the Court (at that time no written opinion was filed). But that decision was appealed, and on the basis of the intervening decision of the Arkansas Supreme Court in Winfrey & Carlile v. Nickles, Ark., 270 S.W.2d 923, the Court of Appeals in Hope Flooring & Lumber Co. v. Boulden, 8 Cir., 215 F.2d 731, remanded the Boulden case to this Court for further proceedings. After further proceedings in the case this Court allowed the plaintiff's attorney a fee based upon the whole recovery, *not because the Court considered the attorney's fee to be a part of the cost of collection*, but because plaintiff's attorney did *all* the work in

the case "with no assistance or apparent cooperation from the Intervenors", and because the Intervenors' interests were antagonistic to those of plaintiff at the crucial stage of the proceedings (when plaintiff was attempting to establish that decedent's death was caused by the accident rather than by tuberculosis; at that time Intervenor had not admitted workmen's compensation liability for said death). Boulden v. Herring, supra, at page 897 of 126 F.Supp.

Stated differently, formerly this Court was of the opinion that attorneys' fees were a part of the cost of collection, but in view of the decision in Winfrey & Carlile v. Nickles, which this Court must follow, the Court is convinced that attorneys' fees are not a part of the cost of collection under the Arkansas statute. In the Nickles case the Court, inter alia, said [270 S.W.2d 927]:

"Had it not been for St. Paul's dual liability the employment of counsel would have come about in this fashion: Nickles, as administrator, retained the Hardin firm as his attorneys, for an agreed fee of half of his interest in the recovery. St. Paul would then have had a genuine interest in the case, since it stood to recoup its entire compensation liability from the third-party tort-feasor. Accordingly St. Paul might either have retained the Hardin firm as its counsel, for a compensation mutually agreed upon, or have employed another attorney of its own choice. *In either event the present question would not have been likely to arise, for ordinarily the court would simply have apportioned the recovery between the two plaintiffs, leaving each to pay his own counsel. Thus in the normal situation St. Paul would incur liability for an attorney's fee in the course of pursuing the tort-feasor."* (Emphasis added.)

It is true that the Court allowed the Hardin firm an attorney's fee based upon the entire recovery, but not because said attorney's fee was a part of the cost of

collection. The allowance was made because the Hardin firm did *all* the work in the case, due to the fact that St. Paul had conflicting interests and its attorney could not assist the Hardin firm.

In the instant case the petitioner, Sisney, employed Mr. Wood to represent him and the respondent, Saint Paul, employed Messrs. Goodwin & Riffel to represent it in the case and the latter firm associated the firm of Messrs. Allen, Woolsey & Fisher with them. Thus, under the clear language of the Court in the Nickles case, the Court should simply apportion the recovery between the plaintiffs, and each plaintiff should pay his or its own counsel.

The total recovery in the instant case was $23,968.36. After the cost of collection is deducted, said amount being $674.09, the sum to be distributed is $23,294.09. Saint Paul has paid, on behalf of Sisney, the sum of $9,107.73 and is entitled to recover said sum, leaving a total of $14,186.54 to be recovered by Sisney. Saint Paul will be required to pay its attorneys in accordance with its contract with them. (In respondents' brief it is stated that said fee was one-third of the recovery, and thus Saint Paul's net recovery, excluding the $674.09 cost of collection, will be $6,071.82, after payment of $3,035.91 as attorneys' fees.) Likewise, Sisney will be required to pay his attorney or attorneys in accordance with his contract or contracts. There is no question but that Sisney had an express oral contract with Mr. Wood and that Wood was to represent Sisney for a fee of one-third of Sisney's net recovery, if any. But there is a serious question as to whether Mr. Fisher and Messrs. Goodwin & Riffel had an implied or a constructive contract with Sisney.

Respondents contend that Mr. Fisher and Messrs. Goodwin & Riffel did practically all the work in connection with Sisney's case—with his acquiescence—and that they therefore had an implied contract with him. On the other hand, petitioner contends that said attorneys were working solely for the benefit of their contractual clients, Saint Paul, Carroll and Jennings, and that any benefits accruing to Sisney were merely incidental to that employment and not sufficient to create an implied or constructive contract, particularly in view of the fact that Sisney had expressly employed Mr. Wood to represent him.

In view of the Nickles case, supra, there is, and can be, no contention that the contract of Goodwin & Riffel with Saint Paul was in any way binding upon Sisney. In this connection, the Court in the Nickles case said:

"First, was the Hardin-Nickles contract binding upon St. Paul? We agree with the Commission's view that it was not. In a third-party action of this kind § 40 quite plainly recognizes separate causes of action in the compensation beneficiary and in the compensation carrier. By subsection (a) the compensation beneficiary is permitted to institute the action, with notice to the carrier so that it may intervene. By subsection (b) the carrier itself may institute the action, joining the compensation beneficiary so that all issues may be settled in one case. There is nothing in the Act to indicate that either plaintiff may force his own attorney upon the other. As a practical matter we know that the beneficiary is apt to have a lawyer of his own and that an insurance company almost always has counsel that are regularly retained. Hence the Hardin firm, in making its contract with Nickles, must be taken to have known that it did not thereby assume a contractual relationship with St. Paul. * * *"

It is evident, then, that Mr. Fisher and Messrs. Goodwin & Riffel are not entitled to an attorney's fee based upon Sisney's portion of the recovery unless they have established the existence of an implied or constructive contract entitling them to such a fee.

In Ward v. United States, 8 Cir., 158 F.2d 499, 502, an implied contract was defined as follows:

" '* * * a promise to pay for services can only be implied when the court can see that they were rendered in such circumstances as authorized the party performing to entertain a reasonable expectation of their payment by the party benefited.' * * * An implied contract is an actual agreement, circumstantially proved. The facts relied upon to establish the agreement will not suffice if entirely consistent with the hypothesis that no such agreement existed."

To like effect, see United States, for Use of Bruce Co., Inc., v. Fraser Const. Co., Inc., D.C.Ark., 87 F.Supp. 1.

The distinction between an implied contract, i. e., a contract implied from the facts, and a constructive contract, i. e., a contract implied in law, was discussed by the Court in Caldwell v. Missouri State Life Ins. Co., 148 Ark. 474, at page 479, 230 S.W. 566, at page 568, the Court quoted from Hertzog v. Hertzog, 29 Pa. 465, as follows:

" '* * * In one case the contract is mere fiction, a form imposed in order to adapt the case to a given remedy; in the other, it is a fact legitimately inferred. In one, the intention is disregarded; in the other, it is ascertained and enforced. In one, the duty defines the contract; in the other, the contract defines the duty.' "

In the Caldwell case the appellant, Caldwell, was an attorney, and he had discovered that appellee's president was using appellee's money for his own private gain. Caldwell ultimately presented his charges to the superintendent of insurance of the State of Missouri, who found the charges to be true and demanded and received the resignation of Hoyt. Subsequently, when appellee filed suit against Caldwell to foreclose a mortgage, Caldwell filed a cross-complaint seeking $60,000 for the services he had rendered appellee. Beginning at page 479 of 148 Ark., at page 568 of 230 S.W., the Court said:

"It is manifest that no contract can be implied from the facts in this case. Caldwell had resigned his position under the plaintiff, and did not during the time he performed the services in question act for the plaintiff. He presented his charges against the president of the company to the directors who resided in Missouri, and they in turn presented the same to the stockholders at their annual meeting. The stockholders declined to take notice of the charges, and re-elected Hoyt as a director, and on the same day the board of directors re-elected him as president. This negatives the idea that the plaintiff accepted the services of Caldwell, or realized that they were deriving any benefit therefrom. Caldwell was not called upon by the corporation to perform the services in question. It not only did not accept his services, but did not even acquiesce in his performance of them. After being turned down by the stockholders, Caldwell presented his charges to the superintendent of insurance, and thereby caused the superintendent to demand and receive Hoyt's resignation. The corporation had no voice in the matter, and the action of Caldwell was purely voluntary. *We cannot perceive how the corporation could be said to have made an implied contract with him by accepting the benefits resulting from his services, which it had no power to reject.* Hence no contract is raised, by implication from the facts, to pay Caldwell what his services are reasonably worth.

"But counsel for the defendant claim that he is entitled to recover on a contract implied in law. There is nothing in the record from which this relation can be implied. There is no general equitable principle that one who receives the benefit of an-

other's work against his will is liable to pay for it. \* \* \* Neither the law alone, nor natural equity, would require the plaintiff to pay the defendant for his services in the present case. Caldwell was under no duty to act in the premises. He was a mere volunteer, and did not act from any sense of duty imposed by law or by his relationship to the plaintiff. He may have been acting as he thought for the public good, but this fact did not make the plaintiff liable for his services. He was under no duty to perform them, and the plaintiff, neither by words, act, nor conduct, recognized, acquiesced in, or accepted his services as beneficial to it. There was no duty performed by Caldwell which could define the contract, nor was there any contract implied by the conduct of the plaintiff." (Emphasis added.)

Another case in which the Court discussed the question of implied contracts is Young v. Fowler, 132 Ark. 145, 200 S.W. 813. In that case the appellee, Fowler, was an attorney and had an express contract with the trustee in bankruptcy, Perry N. Clark; Fowler (and his partner, Ivie) were employed by Clark to prosecute certain objections to the allowance of certain claims as preferred claims in the Bankruptcy Court. Appellant, Young (as trustee for the Bankers Trust Company of Dallas, Texas) was the principal creditor in said proceeding, but was not a party. Fowler contended that in addition to his contract with Clark he had an express, or at least an implied, contract to represent Young, and subsequently he brought an action against Young to recover an attorney's fee. The lower court allowed Fowler a fee. Upon appeal the Court held that the evidence was insufficient to sustain a finding that Fowler had an express contract with Young. With regard to the claim of an implied contract, the Court at page 153 of 132 Ark., at page 816 of 200 S.W. said:

"Nor will a contract to pay a fee be implied in this case from the fact that appellee's firm performed services in the federal court litigation which resulted, or may result, in benefit to appellant. *This is so for the reason, among others, that Fowler & Ivie performed the services under an express contract with the trustee, and their services are referable to that contract.* Davis v. Trimble, 76 Ark. 115, 88 S.W. 920.

"Neither was there a ratification of the employment of appellee's firm, if they were employed or assumed to act in the interest of appellant. The service performed by appellee's firm was consistent with and referable to their contract with the trustee, and appellant had no actual notice that they were assuming to act for him. Under those circumstances, there was no ratification."

See also, City of Ft. Smith v. Southwestern Bell Telephone Co., 220 Ark. 70, 247 S.W.2d 474.

In view of these authorities, the Court is convinced that the facts in the instant case are insufficient to establish either an implied or a constructive contract between Mr. Fisher and Messrs. Goodwin & Riffel and Sisney. In the first place, Sisney had no *power to reject* the services of Fisher, Goodwin and Riffel. As stated by respondents in their brief, Sisney was a necessary party plaintiff to the action and was so designated when the suit was filed. Sisney had no power to prevent the filing of the suit, although he was entitled to reasonable notice and opportunity to be represented in the action. When such notice was given Sisney his mental and physical condition were such that he did not understand the notice, and it was not until October 26, 1953, that he realized he was a plaintiff in a lawsuit. In the meantime he had cooperated with Fisher, Goodwin and Riffel, thinking that they were working on the Carroll and Jennings cases. It is true that Sisney did not reject the services of Fisher, Goodwin and Riffel, simply because he had previously employed Wood to represent him and he did not realize that Fisher,

Goodwin and Riffel were working on a case in which he was a party. Moreover, even if he had desired he could not have rejected their services, since they had the right, under the Statute, to prosecute the action. St. Paul had to have the cooperation of Sisney. Its right to recover the compensation payments depended upon a recovery by Sisney. Of course he could have demanded that his attorney be given at least an equal hand in the prosecution of his case, but he could not have prevented the trial of the case.

A second factor militating against an implied or a constructive contract is the existence of the express contract between Goodwin & Riffel and Saint Paul, and the express contracts between Allen, Woolsey & Fisher and Carroll and Jennings. All the work performed by Fisher, Goodwin and Riffel in connection with Sisney's case was work that was necessary in their representation of Saint Paul, Carroll and Jennings, and *was referable to those contracts*. Insofar as the establishing of the liability of the defendant, Lanza, was concerned, the interests of Saint Paul, Carroll, Jennings and Sisney coincided, and the work done relative to that issue would have been the same, regardless of whether or not Sisney was a party. And, as to the amount of damages to be recovered by Sisney, the interests of Saint Paul and Sisney coincided, since Saint Paul desired a recovery by Sisney in an amount sufficient to permit it to recover the full amount it had expended on Sisney's behalf. There again the work done by Fisher, Goodwin and Riffel would have been required regardless of the status of Sisney. In other words, the work done by Fisher, Goodwin and Riffel was referable to their contracts with Saint Paul, Carroll and Jennings, and the circumstances are not such as to create an implied or a constructive contract with Sisney.

The Court has considered carefully the decisions relied upon by respondents and is of the opinion that the rules stated in said authorities are inapplicable to the instant case. In each of the cases relied upon, Morning Star Mining Co. v. Williams, 171 Ark. 187, 283 S.W. 354; Knights of Pythias of North America Etc. v. Reinberger, 168 Ark. 77, 269 S.W. 41; Boynton v. Brown, 103 Ark. 513, 145 S.W. 242; Davis v. Trimble, 76 Ark. 115, 88 S.W. 920; Fenno v. English, 22 Ark. 170, the party had the duty and the *power to reject* the services of the attorney if he did not desire said services. In none of the cases did the party at all times have an attorney which he had employed personally to represent him. In only one case was the attorney's work clearly referable to a contract with another person, and in that case the Court held that no implied contract existed. Davis v. Trimble, supra. Respondents rely upon the following dictum in the Davis case [76 Ark. 115, 88 S.W. 922]: "If appellants had, by their course of conduct, induced appellees to render the service, or if they had been parties to the suit, and remained silent and accepted the services of appellees, even though employed by another, the law would imply an agreement on their part to pay for the service." However, it is clear that this statement is inapplicable to a case, such as the instant one, where the party has employed his own attorney and has no power to reject the services of the attorney employed by another party.

It is certainly true, as respondents contend, that Fisher, Goodwin and Riffel did a large amount of work that resulted in a substantial recovery by Sisney, as well as by Saint Paul. But it is likewise true that Wood did a substantial, although lesser, amount of work in connection with his representation of Sisney, and it is unfortunate that the preliminary work of the attorneys overlapped as to the contacting of witnesses, etc. This, of course, was the result of Sisney's failure to understand that a suit had been filed by Saint Paul on his, as well as its behalf. If Sisney had realized this and had informed Wood, no doubt Wood would have conferred with Fisher, Goodwin and Riffel, and these attorneys would have worked together in the preparation of the case for trial. As it was,

Wood did not learn of the case until shortly before it was to be tried, and thereafter he cooperated fully and for the benefit of all concerned deferred to the judgment and ability of Fisher, Goodwin and Riffel and permitted them to be the active participants in the trial and subsequent appeal of the case.

If Sisney had been a well man with normal mentality he might be criticized for his failure to understand the proceedings and to inform Wood of the action taken by Fisher, Goodwin and Riffel. But his condition during this time was such that the Court can well understand his inability to comprehend the proceedings that were being taken. In its findings of fact in this case the Court attempted to state the substance of Sisney's physical and mental condition subsequent to the accident. Carroll v. Lanza, D.C.Ark., 116 F.Supp. 491, 500. The fact that his last dismissal from the hospital was on June 3, only nine days before notice of the filing of the suit was mailed to him, helps explain the fact that he did not understand that a suit had been filed on his behalf, as well as on behalf of Saint Paul. Suffice it to say that his mental and physical condition were such that his failure to understand the proceedings, and to notify the respective attorneys of actions that had been and were being taken, cannot be charged against him to such an extent as to create an implied or a constructive contract with Mr. Fisher and Messrs. Goodwin & Riffel.

Thus it follows that Mr. Fisher and Messrs. Goodwin & Riffel are not entitled to an attorney's fee based upon Sisney's portion of the recovery. However, Mr. Wood, in his brief on behalf of petitioner, states that since he had suggested that Goodwin & Riffel prepare the brief on appeal of the case, he feels that said attorneys should be entitled to $500, to be deducted from his fee, for their work in preparing said brief.

In accordance with the foregoing, the money in the registry of the Court should be distributed as follows: Saint Paul-Mercury Indemnity Company—$6,745.91 (being the amount it expended on behalf of Sisney, plus stipulated cost of collection, less its attorney's fee); Lonnie Sisney—$9,457.69, less the amounts heretofore advanced to him by order of the Court; Mr. Fisher and Messrs. Goodwin & Riffel—$3,535.91 (being one-third of Saint Paul's recovery plus the $500 deducted from Wood's fee); Mr. Wood—$4,228.85 (being one-third of Sisney's net recovery, less the $500 paid to Messrs. Goodwin & Riffel for the preparation of the brief on appeal).

A judgment in accordance with the above should be entered.