CONSOLIDATED UNDERWRITERS OF SOUTH CAROLINA INSURANCE COMPANY, Travelers Insurance Company, The Continental Insurance Company and Milwaukee Insurance Co. of Milwaukee, Wis., Plaintiffs,

v.

F. A. BRADSHAW, Porter Montgomery, Ozan Lumber Company, a Corporation, doing business as Prescott Motor Company, Orgill Bros. Arkansas Company, and Hazel Atkins, Defendants,

McMillan & McMillan, Intervenors.

### Civ. A. No. 637.

United States District Court
W. D. Arkansas, Hot Springs Division.
Dec. 7, 1955.

Owens, McHaney, Lofton & McHaney, Little Rock, Ark., for plaintiffs.

G. W. Lookadoo, Arkadelphia, Ark., for F. A. Bradshaw.

J. E. Still, Arkadelphia, Ark., for Porter Montgomery.

D. H. Crawford, Arkadelphia, Ark., for Ozan Lbr. Co.

Townsend & Townsend, Little Rock, Ark., for Orgill Bros.

Ben D. Rowland, Little Rock, Ark., for Hazel Atkins.

McMillan & McMillan, Arkadelphia, Ark., for intervenors.

JOHN E. MILLER, District Judge.

On May 13, 1955, in Civil Action No. 604, Hot Springs Division, this Court entered judgment in favor of F. A. Bradshaw and Porter Montgomery against the Milwaukee Insurance Company of Milwaukee, Wis., in the sum of $5,000. On the same date the Court entered judgment in Civil Action No. 606 in favor of Bradshaw and Montgomery and against the Travelers Insurance Co. in the sum of $5,000.

On the same date the Court entered judgment in Civil Action No. 603 in favor of F. A. Bradshaw against Consolidated Underwriters of the South Carolina Insurance Co. in the sum of $2,500, and a judgment in favor of Bradshaw in Civil Action No. 605 against the Continental Insurance Company in the sum of $2,500.

Subsequent to the entry of the above mentioned judgments, several creditors of Bradshaw made claims against the various insurance companies concerning the proceeds due from the insurance companies to Bradshaw and Montgomery. As a result, on June 25, 1955, the present interpleader action was filed by the said insurance companies. On June 28, 1955, the plaintiff insurance companies paid into the registry of the Court the sum of $15,000, being the face amount of the judgments in Civil Actions Nos. 603 to 606, inclusive, and on the same date the Court entered an order discharging plaintiffs from further liability upon said judgments, except as to costs. (The costs were subsequently paid by plaintiffs, thus completely discharging them.) The order further provided that the "cause be and is continued for distribution of the funds now in the registry of this court and other proceedings herein".

Thereafter pleadings were filed by the following persons or firms, each of whom claimed an interest in the money in the registry of the Court: Ozan Lumber Company; McMillan and McMillan; Hazel Atkins; Porter Montgomery; Orgill Bros. Arkansas Company; and F. A. Bradshaw.

A pretrial conference was had on September 7, 1955, at which time the issues in the case were discussed and the Court fixed the attorneys' fee of plaintiffs at the sum of $200, to be paid to plaintiffs' attorneys out of the funds in the registry of the Court. The case proceeded to trial on November 4, 1955, and at the conclusion thereof the Court took the case under advisement pending receipt of briefs from the various claimants. The briefs have been received and the case is now ready for final disposition.

### Jurisdiction of the Court

At the threshold the Court is confronted with a question of jurisdiction. Each of the plaintiffs is a citizen of a state other than Arkansas. Each of the defendants is a resident and citizen of Arkansas, and the amount involved exceeds the sum of $3,000.

■ Thus, diversity of citizenship is present, and the jurisdictional amount is involved, and it is well settled, at least in this Circuit, that the ·Court has jurisdiction of such an interpleader action, even though the claimants may be citizens of the same state. Hunter v. Federal Life Ins. Co., 8 Cir., 111 F.2d 551; E. C. Robinson Lumber Co. v. Fort, D.C.Mo., 112 F.Supp. 242; 3 Moore's Federal Practice, 2d Edition, page 3012. Therefore, insofar as the first phase of the case is concerned, i. e., the granting of the interpleader, there is little question about the jurisdiction of the Court. There is a serious question, however, concerning the jurisdiction of the Court with respect to the relief that may be granted to the various claimants.

■ Stated differently, an interpleader action normally proceeds in two phases. The first phase is the granting of the interpleader and the discharging of the plaintiff from further liability upon payment of the particular fund into the registry of the court. The second phase of an interpleader action is the determination of the claimants' rights to the fund. In regard to the second phase, each claimant occupies the position of a plaintiff and must establish his claim by a preponderance of the evidence. See Phoenix Mut. Life Ins. Co. of Hartford, Conn. v. Reich, D.C.Pa., 75 F.Supp. 886.

■ Again, there is little doubt about the jurisdiction of the Court to determine the respective rights of the claimants to the fund in the registry of the Court, even though the claimants may be citizens of the same state. See Callwood v. Virgin Islands Nat. Bank, 3 Cir., 221 F.2d 770, 779; Old Colony Ins. Co. v. Lampert, D.C.N.J., 129 F. Supp. 545, 551; Fidelity & Casualty Co. of New York v. Wilson, D.C.S.C., 105 F.Supp. 454, 457.

The real, and somewhat difficult, question of jurisdiction is whether the Court has the power to decide anything other than the rights of the claimants to the fund in the registry of the Court. In other words, the specific question is whether the Court has jurisdiction to enter a judgment or judgments in favor of one or more of the claimants against one or more of the opposing claimants, or whether the Court's jurisdiction is limited to the entry of a judgment merely distributing the fund in the registry of the Court to the claimant or claimants entitled thereto.

The Court is convinced that the latter statement is true, that is, that the jurisdiction of the Court is limited to the distribution of the fund, and that the Court has no power to enter separate judgments as between the claimants. Apparently there is very little authority upon this particular question, but the following language by Judge Delehant in the case of Prudential Ins. Co. of America v. Tomes, D.C.Neb., 45 F.Supp.

353, 356, is indicative of the rule which the Court has concluded is applicable in the instant case:

"It has been suggested that this court in its final judgment may properly make equitable distribution of the proceeds of the policy. The temptation to that course is inviting. *But such distribution is not the proper present function of the court, which is called upon to determine the legal ownership of the fund.*" (Emphasis added.)

Specifically, the Court is of the opinion that its jurisdiction is limited to a determination of the legal ownership of the fund in the registry of the Court, and the judgment of the Court will be limited to such a determination.

### Claim of Porter Montgomery

On April 24, 1954, Montgomery and Bradshaw entered into a contract in which Montgomery agreed to sell a particular building and lot to Bradshaw for a consideration of $10,000 to be paid in monthly installments of $150 each, with interest at six percent per annum, the first of said monthly installments to become due on June 1, 1954. The contract further provided that fire and comprehensive insurance in the amount of $10,000 would be obtained on the property, with a loss payable clause to Porter Montgomery and Bradshaw as their interest might appear.

In the same contract, it was further provided that Bradshaw was indebted to Montgomery in the sum of $2,000, which indebtedness was secured by chattel mortgage on the personal property therein named, being property located in the building and used by Bradshaw in his business. The $2,000 indebtedness of Bradshaw to Montgomery arose by reason of the payment by Montgomery to the Citizens National Bank of Arkadelphia of the balance due on a note in the principal sum of $2,754 which Bradshaw had executed to said Bank.

On April 23, 1954, Travelers Insurance Co. issued to Bradshaw a policy for a period of one year in the sum of $7,000 covering said building, and containing a provision that the loss, if any, on the building should be payable to Porter Montgomery, subject to the provision of the standard mortgage clause attached thereto, i. e., as his interest may appear, and not subject to any act or neglect of the mortgagor.

On the same date, Milwaukee Insurance Co. issued to Bradshaw a policy insuring the building for the period of one year in the sum of $7,000, said policy containing the same standard mortgage clause as the Travelers Insurance Co. policy.

On May 10, 1954, Consolidated Underwriters of the South Carolina Insurance Company issued a policy to Bradshaw for a period of one year in the sum of $7,500 covering the contents of the building, and containing a loss payable clause providing that any loss ascertained and proved should be payable to Porter Montgomery, subject to the terms of the policy. On the same date, Continental Insurance Co. issued to Bradshaw a policy for a period of one year in the sum of $7,500 covering the contents of said building and containing the same loss payable clause appearing in the policy issued by Consolidated Underwriters.

On June 17, 1954, a fire occurred in the building. The four insurance companies denied liability on their respective policies, and in August, 1954, Bradshaw employed the firm of McMillan and McMillan, attorneys in Arkadelphia, Arkansas, to represent him in connection with his claim against the insurance companies.

On September 15, 1954, Civil Actions Nos. 603 and 605 were filed against Consolidated Underwriters and Continental Insurance Company, respectively, wherein Bradshaw was the sole plaintiff. These two actions were on the policies covering the contents of the building. On the same date Civil Action No. 604 against Milwaukee Insurance Co. and 606 against Travelers Insurance Company were filed, wherein· F. A. Brad-

shaw and Porter Montgomery were both parties plaintiff. These two actions were upon the policies covering the building.

Montgomery had the four insurance policies in his possession and retained them until March 26, 1955, when he gave them to Bradshaw's attorney, H. W. McMillan. McMillan's receipt for the policies contained the following provision:

"This is further to certify that in the Suits filed upon the 3rd and 4th mentioned policies by F. A. Bradshaw and Porter Montgomery that Porter Montgomery has authorized the use of his name as a party plaintiff with the distinct understanding that he is only a nominal party and that he is not responsible to us in any way for any fee and is entitled to receive only the amount due him under his contract with F. A. Bradshaw and that we are representing him in this way and only in this way."

Montgomery did not at any time employ the McMillan firm to represent him, and in fact a short time before the trial of the four cases he employed Mr. J. E. Still, an attorney at Arkadelphia, to represent him in the trial of the four cases (which had been consolidated for trial). A big percentage of the preparation for trial and actual trial work was done by Mr. H. W. McMillan, who was representing Bradshaw. In preparing for trial McMillan advanced the total sum of $562.21 in payment of costs of witnesses, depositions, photographs, etc., and of this amount $282.10 represented expenditures that were beneficial to both Montgomery and Bradshaw in the trial of the cases. Neither Montgomery nor his attorney, Mr. Still, specifically authorized the said expenditures, but Montgomery did receive and accept the benefits incidental thereto.

In view of the above-stated facts, a question is presented as to the amount of Montgomery's claim and its priority.

His claim to the sum of $10,000, $5,000 having been recovered from Milwaukee Insurance Co. and $5,000 having been recovered from Travelers Insurance Co., is based upon the standard mortgage clauses contained in the policies issued by said companies. His claim to the sum of $2,000 out of the total of $5,000 recovered from Consolidated Underwriters and Continental Insurance Co. ($2,500 from each company) is based upon the so-called "open" clauses contained in the policies issued by said companies.

The distinction between an open clause and a standard mortgage clause is stated in Lucas County Bank of Toledo, Ohio v. American Casualty Co., 221 Ark. 916, 919, 256 S.W.2d 557, 558, as follows:

"The loss payable clause we are dealing with here is commonly called an 'open' clause and differs materially from the 'standard' mortgage clause, as is well established by many decisions. The essential element of a standard mortgage clause is that it, in effect, provides that the policy, as to the interest of the mortgagee, shall not be invalidated by any act or neglect of the mortgagor, whereas the open clause contains no such provision. See Germania Fire Ins. Co. [of New York] v. Bally, 19 Ariz. 580, 173 P. 1052, 1 A.L.R. 488. In Fulmer v. East Arkansas Abstract & Loan Co., 173 Ark. 668, 293 S.W. 1018, it was stated that, under an open clause, the rights of the mortgagee were no greater than those of the insured. However, in view of the holding in Insurance Underwriters' Agency of the Insurance Co. of State of Pennsylvania v. Pride, 173 Ark. 1016, 294 S.W. 19, we do not hold here that appellant had no right to give the notice provided for in the policy, but it is clear that he had no greater right, and hence no longer time, to give the notice than R. F. Wood had."

■■ The Court will consider first the claim of Montgomery to the sum of $10,000, said claim being based upon the standard mortgage clauses. Inasmuch as the mortgagee's interest under such a clause cannot be invalidated by any act of the mortgagor, it seems too clear for argument that the mortgagee's rights to the proceeds of such a policy are superior to the rights of the mortgagor, and further that the mortgagor cannot in anywise defeat or diminish the mortgagee's rights. Lucas County Bank of Toledo, Ohio v. American Casualty Co., supra. See, also, Kissire v. Plunkett-Jarrell Grocer Co., 103 Ark. 473, 145 S.W. 567; Sharp v. Pease, 193 Ark. 352, 99 S.W.2d 588. More particularly, the mortgagor, by employing an attorney to represent him in a suit against the insurance company, cannot give the attorney a lien upon the mortgagee's interest in the proceeds of the policy. It is evident, then, that Montgomery's claim to the $10,000 recovered from the Milwaukee Insurance Co. and Travelers Insurance Co. is superior to the claims of all other parties herein, including the attorney's lien of McMillan and McMillan, which will be discussed hereinafter.[1]

A more serious question exists with regard to Montgomery's claim of $2,000 based upon the open clauses in the policies issued by the Consolidated Underwriters and the Continental Insurance Co. McMillan and McMillan contend that the case of Fulmer v. East Arkansas Abstract & Loan Co., 173 Ark. 668, 293 S.W. 1018, establishes the priority of their attorney's lien over the claim of Montgomery under the open clauses. The Court, however, has concluded that the decision in the Fulmer case does not sustain the contention of McMillan and McMillan.

In that case the mortgagor had obtained the insurance from the Abstract Company and had not paid the premiums. When premiums in the total sum of $1,164.81, covering a period of several years, were past due, the mortgagor executed a note to the Abstract Company for said sum, the note providing that in the event of loss under the policy, the note was to be paid out of the funds due the mortgagor-insured as a result of said loss. Subsequently, a loss occurred and the question arose as to priority between the Abstract Company and the mortgagee, since the insurance policy had a loss payable clause in favor of said mortgagee. The Court held that the mortgagee had no greater rights in the policy than the mortgagor, and that the mortgagor's contract with the Abstract Company to pay said company out of the amount recovered under the policy entitled the Abstract Company to priority over the mortgagee. In other words, the Court held that the person or company paying the premium on the policy had priority over a mortgagee under a loss payable clause, but this Court does not believe that said decision is authority for the contention that the attorney's lien of an attorney representing the mortgagor should likewise have priority over the mortgagee.

Moreover, in Insurance Underwriters' Agency of the Insurance Co. of State of Pennsylvania v. Pride, 173 Ark. 1016, at page 1021, 294 S.W. 19, at page 21, the Court said:

"We think a mortgagee or lienholder acquires a vested and enforceable right under an ordinary loss payable clause as his interest may appear in an insurance policy, which cannot be destroyed by a settlement or adjustment between the insurer and the insured."

---

1. At this point it might be noted that Bradshaw had paid Montgomery $150 on the $10,000 indebtedness. However, the accrued interest on the $10,000 amounts to substantially more than $150, and therefore Montgomery's interest in the $10,000 recovery extends to the full amount thereof as against Bradshaw.

As a matter of fact, the amount due from Bradshaw to Montgomery on the building is more than $10,000 by virtue of the accrued interest, but the recovery from the insurance companies was limited to $10,000 and the Court is limiting its decision in this regard to the ownership of said $10,000.

To the same effect, see Cash v. Home Ins. Co. of New York, 197 Ark. 670, 125 S.W.2d 99.

If the mortgagee's right cannot be destroyed by a settlement or adjustment between the insurer and the insured-mortgagor, likewise the mortgagee's right cannot be destroyed by an agreement between the insured-mortgagor and his attorney with regard to an attorney's fee. Especially is this true in the instant case since McMillan and McMillan at all times had notice of Montgomery's interest under the policies. In fact, Mr. H. W. McMillan prepared the contract for the sale of the property from Montgomery to Bradshaw, said contract providing that insurance would be obtained on the property with a loss payable clause in favor of Montgomery. Thus, McMillan had full knowledge of Montgomery's rights at the time he accepted employment from Bradshaw, and in addition in the receipt given Montgomery for the insurance policies McMillan specifically stated that Montgomery "is not responsible to us in any way for any fee and is entitled to receive only the amount due him under the contract with F. A. Bradshaw * * *". The Court is of the opinion, therefore, that the lien of McMillan and McMillan for an attorney's fee cannot take precedence over the claim of Montgomery to the $2,000 under the loss payable clauses in the policy.

■ And, of course, the fact that McMillan and McMillan did a substantial amount of work which inured to the benefit of Montgomery does not make Montgomery liable to them for an attorney's fee. King v. The Fish Factory No. 1, D.C.N.C., 132 F.Supp. 858, 862; St. Paul-Mercury Indem. Co. v. Lanza,

D.C.W.D.Ark., 131 F.Supp. 684. Compare, United States v. Certain Lands in Town of Highlands, N. Y., D.C.N.Y., 49 F.Supp. 962, 968 (stating that an attorney's lien "would only attach to that portion of the award owned by the client of the attorneys * * *.")

■■ It follows that Montgomery's claim to the $2,000 is superior to the claim of McMillan and McMillan and to the claims of the remaining claimants.[2] But, in equity the Court feels that Montgomery must bear his proportionate share of the $200 attorney's fee granted interpleader's attorney and the $282.10 in trial expenses. Inasmuch as Montgomery's claim is being sustained in the amount of $12,000 of the total of $15,000 paid into the registry of the Court, 12/15ths of the $482.10 should be charged to Montgomery's recovery, leaving him a net recovery of $11,614.32. It is true that neither Montgomery nor his attorney specifically authorized McMillan to incur these expenses, but Montgomery accepted and received the benefits therefrom and in equity should pay his portion of the same. Particularly is this true in view of the fact that Montgomery seemingly took so little interest in his own claim and did not employ his own attorney until shortly before the trial.

### Claim of McMillan and McMillan

As heretofore stated, in August, 1954, Bradshaw employed McMillan and McMillan to represent him in connection with his claim against the insurance companies. In the original contract of employment it was agreed that if the case should proceed to trial, McMillan and McMillan were to receive "25% of the amount recovered. The amount recovered shall include also any and all penalties and attorney's fees allowed by

---

2. Actually Montgomery's claim, as against Bradshaw, might be slightly in excess of $2,000. Bradshaw had paid $100 on this indebtedness, but Montgomery's 6 percent interest on the balance would be equal to or greater than $100. However, the record does not disclose when the $100 payment was made and the accrued interest cannot be determined with any degree of certainty. Therefore, the Court is of the opinion that Montgomery's claim, as against the other claimants, is $2,000.

the court". The original written contract was never signed, but Bradshaw and McMillan and McMillan orally agreed to said terms. Apparently the written contract was not signed because, at Bradshaw's request (he wanted Montgomery to help pay the attorney's fee), the contract was prepared for signature by both Bradshaw and Montgomery, and Montgomery refused to sign the contract.

Subsequently Bradshaw was indicted for arson in connection with the burning of his building. McMillan and McMillan agreed to represent Bradshaw in the criminal case for a fee of $1,500. Also, sometime during this period Bradshaw purchased a house, and McMillan guaranteed the seller that Bradshaw would pay the purchase price. As a result of these developments, the following agreement was executed by Bradshaw and McMillan and McMillan:

"Amendment to Contract of
Employment

"On the —— day of August, 1954, a contract of employment was entered into by and between F. A. Bradshaw and Porter Montgomery and McMillan and McMillan covering the employment of McMillan & McMillan Attorneys to represent Bradshaw and Montgomery in their claim arising against certain insurance companies out of a fire which occurred on or about June 17, 1954 at 414 Main Street, Arkadelphia, Arkansas. The parties agree that in view of the changed circumstances the contract of employment should be amended as follows:

"McMillan & McMillan shall receive as compensation for their services 50% of any and all amounts recovered either by suit or compromise. The amount recovered shall include any and all penalties, attorney's fees and interest.

"/s/ F. A. Bradshaw
F. A. Bradshaw

Porter Montgomery
/s/ H. W. McMillan
McMillan & McMillan

"Fee is actually 30% & balance to be applied on indebtedness due for house & other services.

"/s/ H. W. McMillan
/s/ F. A. Bradshaw"

(The last paragraph was handwritten across the bottom of the agreement.)

This amendment was executed prior to the trial of the four insurance cases and was signed by Bradshaw and H. W. McMillan, but the handwritten notation stating that the fee was actually 30 percent was made by Mr. H. W. McMillan after the trial of said cases. There was a dispute in the testimony as to the terms of the final agreement of the parties. Bradshaw testified that the fee was to be 25 percent of the net recovery granted to him. To the contrary, McMillan testified that the agreement was that the attorney's fee was to be 30 percent of the total recovery, and that the extra 20 percent was merely security for payment of the fee in the criminal case and for the guarantee of McMillan on Bradshaw's purchase of the house.

The Court is convinced that McMillan's testimony was correct and that the fee was actually 30 percent of the total amount recovered. The Court is further convinced that Bradshaw understood the terms of the contract and that there was a meeting of the minds between McMillan and him in that regard. The total recovery from the insurance companies went to Bradshaw's benefit, even though $12,000 of said amount would actually be paid to Montgomery. This is true since the payment of said $12,000 extinguished Bradshaw's debt to Montgomery.

In this connection Bradshaw contends that the case of St. Paul-Mercury Indem. Co. v. Lanza, supra, supports his contention that the attorney's fee of McMillan and McMillan was to be based upon Bradshaw's net recovery. In that case the Court held in an action by an employee and his employer's workman's compensation insurance carrier against a third party tort-feasor under the Arkansas Workman's Compensation Act, Ark.Stats. § 81–1340(b), that the insurer and the employee each employed his or its own attorney, and that the services of the insurer's attorney which inured to the benefit of the employee did not give said attorney a right to an attorney's fee based upon the employee's portion of the recovery against the third party tort-feasor. The difference between that case and the instant case is that in the former neither the employee nor the insurer was indebted to the other, and the recovery of each redounded to his or its sole benefit, while in this case Bradshaw was indebted to Montgomery in the sum of $12,000 and the recovery of said sum from the insurance companies, athough payable to Montgomery, was in fact a recovery by Bradshaw since it extinguished his debt.

Therefore, the attorney's fee of Mc-Millan and McMillan was $4,500, which is 30 percent of the $15,000 recovered, and under the provisions of Sec. 25–301, Ark.Stats.Ann.1947, McMillan and Mc-Millan have an attorney's lien on Bradshaw's portion of the recovery.

As a matter of fact, Bradshaw would be in no better position if the Court were to accept his testimony that his understanding of the contract of employment was that McMillan and Mc-Millan were to receive 25 percent of his net recovery. This is true since it is clear that McMillan and McMillan at all times intended that their fee was to be based upon the total recovery, and thus if Bradshaw thought differently, there would have been no meeting of the minds and no express contract. In that event, McMillan and McMillan, having performed the services for Bradshaw, would be entitled to recover on a quantum meruit basis. The Court is fully advised of the difficult nature of the four cases that were consolidated for trial and tried in this Court, and in view of this fact, together with Mr. H. W. McMillan's testimony concerning pretrial preparation, the Court is of the opinion that McMillan and McMillan would be entitled to an attorney's fee of $4,500 on a quantum meruit basis. But, as heretofore stated, the Court is convinced that there was a meeting of the minds between McMillan and Bradshaw and an express contract for an attorney's fee of 30 percent of the total recovery.

McMillan and McMillan's attorney's lien attached to Bradshaw's cause of action when the complaints were filed against the insurance companies on September 15, 1954, and summons was issued therein, and said attorney's lien is superior to the liens of Bradshaw's creditors, including the claim of Ozan Lumber Company. McNeill v. Percy, 201 Ark. 454, 145 S.W.2d 32.

The judgment of Ozan Lumber Company was entered July 15, 1954, but no execution or garnishment was issued on the judgment until after the lien of McMillan and McMillan had attached by the filing of the suits on September 15, 1954, and the issuing of summons thereon. Under the Arkansas law a judgment does not constitute a lien upon personal property until execution or garnishment is issued and the writ delivered to the officer in the proper county to be executed. See Sec. 30–116, Ark.Stats.Ann.1947; Von Segerlund v. Dysart, 9 Cir., 137 F.2d 755; In Matter of Van Meter, D.C.W.D.Ark., 135 F. Supp. 781; Baldwin v. Johnston, 8 Ark. 260.

Thus, the attorney's lien of McMillan and McMillan has priority over the claim of Ozan Lumber Company and over the claims of the remaining claimants. Bradshaw's portion of the $15,000 recovery is $3,000, less his proportionate

part of the $200 attorney's fee allowed plaintiffs' attorney, making his net claim $2,960. McMillan and McMillan by virtue of their attorney's lien are entitled to recover this amount, together with $225.68 (being Montgomery's proportionate share of the $282.10 expended by McMillan and McMillan in trial expenses), from the fund in the registry of the Court.

### Claims of Ozan Lumber Co., Orgill Bros. Arkansas Company, and Hazel Atkins

The Court has heretofore found that Montgomery's claim had first priority in the amount of $11,614.32 and that McMillan and McMillan's claim had second priority in the amount of $3,185.68. Thus, these two claims, together with the $200 attorney's fee, exhaust the $15,000 which was deposited in the registry of the Court.

If the Court had jurisdiction to do so, it would enter a judgment in favor of Ozan Lumber Company against Bradshaw in the sum of $304.06, with interest (based on its judgment of July 15, 1954); a judgment in favor of Orgill Bros. Arkansas Company against Bradshaw in the sum of $2,193.80 (based on the amount Bradshaw owes Orgill Bros. upon the open account); a judgment in favor of Hazel Atkins against Bradshaw in the sum of $400 (based upon Bradshaw's note of April 14, 1955, in said amount); and a judgment in favor of McMillan and McMillan against Bradshaw for the remainder of their attorney's fee and trial expenses. As heretofore stated, however, the Court is of the opinion that its jurisdiction is limited to a determination of the legal ownership of the fund. The Court has made that determination, with the result that Porter Montgomery and McMillan and McMillan are entitled to receive the sum of $14,800 remaining after payment of plaintiffs' $200 attorney's fee, thus leaving no funds in the registry of the Court with which to satisfy the claims of the remaining claimants.

In accordance with the foregoing a judgment should be entered distributing the funds in the registry of the Court as follows: Porter Montgomery, $11,614.32; McMillan and McMillan, $3,185.68. The claims of the remaining claimants will be dismissed without prejudice.